It's 4-10-24, Thurman v. Champaign Park District. For the appellate, it's Mr. Dorris. For the appellate, it's Mr. Dutton. Before I begin, counsel, I want to acknowledge that we changed the time of this oral argument. And I want to thank both counsel for your willingness to work with our clerk to find a time consistent with the change in our schedule. We appreciate it very much, so I want to thank you before we begin. Without further ado then, Mr. Dorris, you may proceed, sir. May it please the court. Counsel. I represent the plaintiff in the case that was dismissed by Judge Michael Q. Jones of Champaign County. And I'm somewhat hesitant to stand before this honorable court and suggest that Judge        Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  I do appreciate the profound and deep respect for him. He is always prepared.  Who can I trust this with? Keep your voice up, please. Yes sir. I would rather characterize it as the magnificent skills of my opponent representing his client got an obtained result and may have misdirected Judge Jones to arrive at that wrong decision, because this decision I believe is simply incorrect. I also would like to change one misconception my opponent has. He in his brief indicated that we believe this is a complicated situation. I don't. And I couldn't agree with Mr. Dutton anymore, but I think it's fairly simple. I believe that it's a factual interpretation of the facts and whether they rise to plead a cause of action that would overcome the immunity that was granted by our legislature to local governmental units by statute. I believe the facts have just been misinterpreted as to whether or not it rises to willful and want. This is a problematic area, although it's fairly simple and straightforward. I don't know that there's any disagreement about the underlying law that applies to this case. I believe it's a factual determination as to whether or not the facts that we've pled rise to the level or could be found by a jury to be willful and want. We basically have, I think all of us understand, we have three different, in a tort action, we have three different levels, gross levels of behavior. We have negligence. It's referred to in this case as mere negligence. We might refer to it as a mistake, an error. We all know the legal standard is negligence is that behavior which is contrary to what a reasonably safe person would do in similar circumstances. Then we have the other end of the spectrum, intentional tort. This could be anything from murder to some type of assault or a lot of others where you intend to harm somebody. But there was a need for some middle ground, and it was defined by the terms willful and want. And I believe historically the reason for that middle ground was originally in those cases where it was the law believed people should be punished for particularly offensive behavior that was short of intentional, punitive damages. And then when we go forward with the local governmental bodies where there was a desire by the legislature to protect them from certain types of suits, they ruled that they were immune from a suit based on negligence, a mistake. But they were guilty if they were guilty of willful and want. Unfortunately, the legislature used slightly different language in defining willful and want than the case law had used in prior cases. It had previously been referred to by case law as reckless behavior. I believe there's a case we didn't cite, but somewhere in the United States, where somebody would hear the evidence and they would gasp and say, oh, my God, they didn't. Something that's more than negligence. And we've had trouble defining that, and our opponent has brought up the fact that we cited one case that was not against the local governmental body. It was against, but by certain circumstances of that case, they had to prove willful and want. And there they'd use the term reckless in that decision. And I would assert that that case you may find is not controlled. Because of the strikingly similar factual situation, it gives good guidance. What are you talking about? The Olay case. Pardon me? The Olay case. The problem with that, Justice McCullough, is that case was decided against a party that was not subject to the immunity. But it was a willful and want case. But the facts are so strikingly similar with that case that it gives guidance in this case. And I quite frankly really have a problem with the splitting of hairs trying to decide what the difference between reckless and utter indifference or conscious disregard for safety of others or their property is. And I don't think any court in Illinois has ever said that there's a difference in those terminology. In fact, I think that we cited one case that would suggest there is no real difference. So I'm not suggesting that the Olay case controls your decision in this case. How is that case spelled? O-E-L-Z-E. I may be mispronouncing it. Okay, go ahead. I believe that this case revolves, just as I argued to Judge Jones, it revolves around one thing. We had a condition with this tennis court that we all know presented a danger. How do we know that? Because the Park District had made a feeble attempt to alleviate the danger by patting these steel towers. Had there been injuries before? No, sir. At least not that we knew. And they filed an affidavit saying there had been no prior injury. Is that important? It has some importance factually for the jury to consider. I don't think it does at this point. Was that the Spencer affidavit you made reference to? Yes, sir. Is there any problem with the trial courts considering that? No, sir. Not on that issue. Spencer, the only testimony was Spencer was, he was not aware of any prior accident. That's the only thing in the record. All right, that's in support of their 2619 claim. Yes. The reason it's not conclusive is because these columns were only several inches wide and they were sporadic behind this tarp. So we expect that a high percentage of the contacts with that tarp would not come in contact with where the danger was. So it's very possible you could have had this operational for a long period of time without anybody striking a column. It's just the luck of pure chance whether you would strike the tarp at a point where there was nothing behind it or whether there was this. The Elise case, the striking similarity was this. You had a tarp there. You had a tennis court. The danger, though, there was a rope or rope ladder that had been placed. It was not a permanent fixture. It was there. And a person, because he couldn't see it because of the tarp, became entangled and injured by that rope. It's been suggested the fact that it wasn't a permanent feature somehow makes that case more persuasive in support of my opponent's position. On the contrary, we know that the Park District in this case recognized there was a danger because they made an attempt to pack it. Do you agree with the First District and Olsey that the pleadings must show a conscious indifference by the defendant? Yes, sir. Is there a problem, though, where you're arguing, if that's the standard, that the fact of what they tried to do here in their padding, how does this show conscious indifference? In other words, it seems to me maybe the issue is not that they were indifferent, but they didn't do it as well as they should have, which might be negligence, as opposed to indifference being, hey, just throw up a tarp, forget about it. I would agree with you 100 percent, except for one thing. What's that? They hid this. By putting the tarp up, nobody could see that danger or the padding, and they made the situation worse. We know the padding wasn't effective because this man sustained a very serious injury. He struck an unpadded portion of that column at a height where his head and neck were, and it caused spinal injury, a very serious injury. It's the key crucial element to us. If there was no tarp there and they padded it, I agree with you. I believe that that would be mere negligence. They just didn't do a good enough job. But they didn't do a good enough job, and then they concealed it behind here. What could have been interpreted as an open and obvious danger was made not open and obvious by their action when they were in recognition that it posed a danger. The Wolfram-Wanton misconduct in this case is to place that tarp there, which would give all the appearance of a soft barrier, and when you're in the situation you're playing tennis, you have a long shot to the baseline, and you go back. Your limits of when you can strike the ball to return it is defined by the court. But we all know that your going back and your momentum may very well carry you into that, and there's no way for a person to have known where those columns were. And there's also a physical feature about these columns. They are not straight up and down. The base of them is farther away from that tarp than the area where this man struck it. The area where he was injured was closer to that tarp. We don't have any measurements of the exact distance between the tarp, but it angled out as the elevation increased on that column. Mr. Doris, the beams, the way I understood it from looking at the pictures, weren't totally concealed. There was an opening in the tarp where you could see the top of the beam. Much above eye level and certainly would not be there for a tennis player during a competitive tennis match to see it. They were up, I don't believe that distance is in the record either, but it was way above height. The ceiling height in this room is a minimum of 30 feet. It was up high above the tarps, and the tarps were, from the photographs you can see, you can make your own judgment, but they were perhaps 10, 12 feet. And it was above that. Some portion of that beam would be visible. There are other cases that we cite that are very supportive of our position. Palmer v. Chicago Park District, from the First District, where a fence had been down for several months and there was injury. An even more definitive case that's more close to our position is where you had some pipes that were in tall grass, and that situation was determined to be willful and wanton. Where the key element to this case is the fact that their action made it less apparent and the danger more profound to a person using a tennis court than it was before they did anything. It's the fact they put this tarp, which would give the appearance of a soft barrier, but it had sporadically, periodically, these hard columns. By pure luck, you made contact there. You could sustain very serious injuries. I'd give you an example. Now, I'm going to go to an extreme, but it sort of has the same concept as what we're talking about here. What if we had a situation where we had a wall, and from the wall there was rebar, a piece of rebar sticking out. There's a what? Rebar. What's rebar? Okay. Rebar is the reinforcing rod in hot concrete. Okay. And it's sticking out. It's a sharp point. And they put a little padding on it near the wall, but the sharp point's left. And then they put a tarp on it. I think we can all see that that's a... But the concept's the same, because we had this metal column that's right there. If somebody contacts it, it's going to be injured. But in that situation, we would all understand. You took a danger, and you hid it. So if the park district contacted you in advance and said, take a look at this. We want to avoid liability. What else should we do? What would you have said? I think it's pretty clear. Put a mesh tarp up that you can see through. A mesh tarp? Yes. It would serve all the same purposes. It didn't have to be an opaque tarp that hid where these columns were. I think that solution... I'm not an engineer. I'm not an architect. But just as a plain country lawyer, it seems to be... If it had been a mesh tarp, you wouldn't be here. I think that if it was a mesh... I believe the crucial element that makes this a potential willful and wanton finding by a jury is that that danger was hidden from users of the tennis court. So using an opaque tarp instead of a mesh one constitutes willful indifference? When you have a known danger. Conscious indifference? I just made a mistake. I'm looking at the same continuum that you spoke of earlier, Mr. Doris. I'm trying to find the distinction between this wasn't as good as it could have been or it was a mistake. That's negligence to conscious indifference. The conscious indifference, in my opinion, is this. We know they knew it presented the danger. How do we know that? They put padding on it. They knew it was dangerous. And then what makes it willful and wanton or conscious, then they hid it. Isn't it conscious indifference if they didn't put padding on it? No. Not putting padding on it might have... That says, I know there's a problem here and we're going to try to address it, and maybe the negligence would be if they didn't address it adequately. I think that's true, except they made it worse by placing an opaque barrier where you couldn't see. And the fact they made a dangerous condition worse, they took some action that they believed apparently would provide some protection, but then they made it all go away and worse by putting an opaque tarp in front of it where nobody could tell where these columns were. Another case that is probably very instructive on this is Benhart v. Rockford Park District, where they had a swimming pool. And because of slippage in the swimming pool, they put these strips down so you would have better traction. At some point, for whatever reason, they decided to remove them. And they asserted in that case they removed them to make it safer. But in fact, they didn't. It made it more dangerous. That's our point in this case, is the actions of this part of this tennis facility with the expressed knowledge that there was a danger. Well, this is a thought. You know, I'm not a big tennis player. I've played some. I've seen places like this. Why wouldn't the people at the park district think, oh, the inference is behind the curtain is a wall. Don't run into it. In other words, implicit in your argument is the notion that someone playing tennis on this court should think that behind this tarp is open space. It seems to me that the better argument would be behind this tarp is a wall. This is just there, you know, as a backstop to show you a good place to hit against. But on what basis should we think that the normal user would just think that the tarp extends into open space that you could run into it with a computer? I think you could turn to Mr. Spencer's affidavit. Why did they put the tarp up? That's a different question. I just want to focus on the typical user for a moment. Why should we view the user as thinking that there is just empty air behind the tarp so that you could run into the tarp with impunity? Where does that come from? I think for two reasons. And one of them does have to do with Spencer, why they put it up. Because I think the users would understand why they put it up. It's put up, and they use these tennis association standards in support of their argument. But nowhere in the record will you say those tennis standards are for safety. They're to promote conducive, efficient play of the tennis players. The tarps are put up to protect people coming and going on their course so they don't get hit with tennis balls. And to keep the balls in an area. It's for the conduciveness of the player. And I think a player would understand that. And they would see the soft tarp and expect that it would be something that would not pose a danger to them. Well, if there were a wall behind it, they'd put up the same tarp, wouldn't they, for purposes of the game being able to see the ball well? You could do that with a wall. But there was also an area where people came and went from the tennis courts behind the tarp, and they wanted to seal that off where they wouldn't be getting hit with tennis balls. And it just makes the play more efficient and favorable to the players. There's nothing about that. Because if you had a wall right behind it, why would you put a tarp up? So they can see clearly. Well, paint the wall. But, you know, if you haven't addressed the point, why should the Park District think someone playing on the court would view the tarp and believe they could run into it with impunity? The appearance of it would be the second reason. It gives all the appearance that it's a safety net, that it's a soft landing point. And tennis players do use all the area to hit balls back in their momentum. They can't always stop. But if they know it's a chain-link fence, they know what they're confronting. Here it gave the appearance of a soft, safe landing point, and it wasn't, at least in certain areas. You mentioned the Tennis Association standards just a moment ago. Yes, sir. Is there anything before us to indicate that what occurred here was some sort of violation of those standards? No, sir. No violation. Doesn't that address it? In fact, they say they complied with it. But. Well, if that's the case, doesn't that make it harder to view this as a matter of conscious disregard? No, sir. Because nowhere in the record is anything about the Tennis Association standards indicate that it was done with any consideration of safety. It's just to promote efficient play of tennis. That's what the Tennis Association is about. There's nothing. Look at the record. There's nothing to say it's a safety standard. On the contrary, we have an affidavit attached to our response from an architect, say they were in violation of the Illinois Accessibility Code for projections and walls, which is a safety standard. So the standard. So that was an affidavit in opposition to their motion to dismiss? Their motion to dismiss. I see. So the Tennis Association, in my opinion, my humble opinion, sir, is incorrect because it's just to promote efficient play of the tennis match. It's not for safety. Thank you, Mr. Dawes. You have an opportunity to address this again in rebuttal. Thank you. Mr. Dutton. Thank you very much. If it please the Court. Counsel. My name is Ed Dutton. Together with Attorney Guy Hall, we represent the Champaign Park District on the ambulee today. I begin by, first of all, thanking you for the opportunity to appear before you. It doesn't happen all the time, and I truly appreciate it. Well, it was my thanks I expressed to Mr. Doris also apply to you for your willingness to move your schedule. I appreciate the courtesy of both you and Mr. Doris for the Court's benefit. Absolutely happy to, Your Honor. It was easily enough done. A couple of points. First of all, Mr. Doris gives me a nice compliment when he suggests that I was somehow misleading Judge Jones. I have more respect for Judge Jones in that. I'm sure Mr. Doris and I both do. There was no misleading here with Judge Jones. I think his characterization was that Judge Jones is a terrific judge, and you're some sort of silver-tongued devil. I think it's the same implication. Yeah, just wowed him so much that he lost his normal good sense. I'm going to go back and read that transcript. Okay. The point is this. I think we are in agreement, the Court and also Mr. Doris, that actually this is not a complicated set of facts. And, in fact, the key facts are it's an indoor tennis facility, Justice Stegman. You pointed that out. Indoor tennis facility means there's going to be walls somewhere. By definition, they have to be. By the way, given my limited attention span, I wanted to ask you a question. Please forgive me if I'm interrupting your argument too much. On the last point that Mr. Doris made about the tennis association standards, if I understood him correctly, he was saying, hey, this is just for recreational purposes, and the Spencer affidavit dealing with the tennis association standards, they don't purport to deal with anything about safety at all, if I understood his argument. Is he correct in that? No, I don't believe so. Does the Spencer affidavit address that in any way? It does in this sense. What the Spencer affidavit says is there is a recommended guideline put out by the U.S. Tennis Association, USDA, and that recommended guideline gives recommended distances for side distance from the court and for drop from the court. I highly doubt it's for efficiency purposes. What I do know is the minimum distance sets a certain parameter behind the baseline and what they call the boundary or backstop, and that we exceeded that in this instance. That's why it's there. What we were saying is, because the flip side is, as you pointed out, Justice Seidman, the flip side is had we violated a standard or a guideline, I'd be arguing differently here, and I'd be arguing that had we violated the guideline, it's merely a guideline. Let's even take it as a standard. The important point is the fact that we exceeded it. It was exactly for the reason that if we're arguing the issue of whether we exercised a conscious regard for the safety of our patrons, the fact that we not only met but even exceeded the U.S. T. guideline on the distance is a significant fact. That's why it's there. I believe it's a safety guideline. Mr. Doris can believe it's there for the efficiency of the game. What I do know is we exceeded it. That's the important thing. Do the guidelines address this at all? Do they say, by the way, it's for the efficiency of the game and general safety of the players, or do they just don't talk about that at all? Actually, I believe they do. I didn't put the entire guideline before the trial court because much of it, I believe it's more than 140 pages if you download it off the Internet. Much of it talks about, in finite detail, the rules of the game. Then there are several sections, and I pulled out the relevant one for recreational and club play, which is what applies here. There are several sections that deal with either international play or recreational and club play, and then they deal with the physical setup of the courts, and it also talks about if you have multiple courts in a line, for example. I didn't copy all of those and make them part of the record because they weren't relevant to the allegations. The allegations dealt with there was insufficient distance from the baseline to the fixed object, and I said, well, guess what? We exceeded the U.S. T. guideline, and that's why it was there. Getting back to where I don't think there's any dispute among the facts. In this case, I think it's also very significant that the beam was not out of place. It was supposed to be there. It's a permanent part of the building. Mr. Doris has talked about the O'Lee's case, that's how I pronounce it anyway, as being significant or controlling or instructive, and what's so significant in O'Lee's from a factual standpoint is the tennis pro and the club manager both were deposed and admitted that the ladder that the woman fell over that was immediately behind the tarp was not supposed to be there. It was out of place. That makes it a defective condition. That makes perfect sense to me. I have no argument with that from a factual standpoint. I break off with O'Lee's with regard to the standard they applied, but I'll get to that in a minute, but from a factual standpoint, O'Lee's is not even close to my point here. So, having said that, there's no dispute also that 3106, recreational property immunity, applies in this case. I brought that up as a Section 2619 part of the 2619 portion of the combined motion to dismiss because I need to establish that it's a Willful and Wanton standard that applies. So, where we really break off is what definition of Willful and Wanton conduct applies here, and as Mr. Doris has said, if you open up the law books, you will find definitions all over the place, and, in fact, the Supreme Court in Ziarko, Justice McMurrow did an enormously large job of cataloging, and that's what the Ziarko case is. It's a cataloging of all of the common law definitions of Willful and Wanton conduct, and they are all over the board, and that's why the Supreme Court in Ziarko, when they were addressing the common law definition, said it's a sliding scale, using their term. I call it a slippery slope. Sliding scale. On one end, it's slightly more than mere negligence. On the other end, it's slightly less than intentional conduct, and it's on a spectrum, somewhere in between there. That's what the common law is. The Tort Immunity Act definition is statutorily defined and is very different. Unlike the common law definition, the statutory definition in Section 1-210 of the Tort Immunity Act does not include, most significantly, the word recklessness. It also does not include the word carelessness, or it doesn't include, what's the other one that was in there, ordinary care. You'll actually find those very allegations in Mr. Doris's complaint. He says that we failed to exercise ordinary care to maintain a safe tennis facility. That's directly out of the complaint. He also says that we failed to exercise reasonable care. Those words in the complaint are the hallmark of a negligence application. No question whatsoever, which is why I raised 3106, immunity in response. The Tort Immunity Act definition is very, very different from that. The Tort Immunity Act definition talks about either intentional conduct or an utter indifference and conscious disregard for the safety of others, and also requires a course of action. Those are hallmarks of the statutory definition, and completely different from the common law definition. Two points drive that home. Back in 1998, effective December 2, the legislature added a sentence. I pointed it out in a footnote in my brief, because when the plaintiff's brief, the Appellant's brief was filed, they cited the definition of 1-210, but they cited a version prior to 1998. It didn't have the key sentence that was added in 1998. It didn't change the definition, but what it said was, this is the definition that shall apply. Not may apply, not could apply. This is the definition that shall apply in any action against a local public entity arising under the Tort Immunity Act. That is significant. It was the legislature, and then we have parts of the legislative record that are actually cited in the Taglier case, Taglier v. Westman Springs, where the legislature was represented. DART makes clear that the legislature was saying the common law definition is different than the Tort Immunity Act definition, and when you're dealing with a local public entity, it's the statutory definition that will apply. To bring it home, what I did was cite a case, actually Justice Steinman, you were a concurring opinion in that case, the Lowe v. Provena case. It doesn't deal with the Tort Immunity Act. It deals with the Hospital Licensing Act. But Section 10.2 of the Hospital Licensing Act has nearly identical language to the Tort Immunity Act's definition in 1-210. It also has the course of action requirement. It has utter indifference to or conscious disregard for, and it doesn't use the words reckless or careless or negligent. And what this court said was that's a specialized definition, and where you have a statutory definition, you apply that. That's exactly what the First District Appellate Court did in the Taglier case within the past year. That's what Judge Jones did in this case, recognized that there's a distinction between those definitions, that the case law matters whether it's decided under the Tort Immunity Act or the common law definition, and because we're dealing with a public entity here, it is the more stringent Tort Immunity Act definition that applies, which has the course of action and doesn't include recklessness. So going through that analysis, I cited a number of cases where the courts had even applied the common law definition with regard to a local public entity and hadn't found that acts that were more significant and severe than those pleaded here didn't rise to the level. I cited that in a dozen cases. I was only going to touch on a couple of them here. One of those is Pomero. In Pomero v. Community School District 21, you have a fifth grade student and you have the teacher, gym instructor, direct the student to run full speed toward a known property defect. That's significant. No defect, direction to run towards it. And the Appellate Court says, even with that synergy of facts, that is not enough to hit the Tort Immunity Act definition of Wilfelin I, which requires something much, much more than merely disregarding a known danger. Again, common law definition, that may have been enough, not under the Tort Immunity Act definition. Mr. Dutton, what about the Illinois Supreme Court case in Murray? Hadn't talked about Murray. What's most significant about Murray, other than the facts, Murray is completely factually different from here. You had an expert that said that they, I think it was the worst gymnastics program they'd ever seen, et cetera, violated multiple recommendations and guidelines. But more significantly, the accident in Murray occurred in 1992. Why that's significant, I talked before about the legislature amended Section 1210 of the Tort Immunity Act in 1998. In the Murray court, the Supreme Court says, Justice Kilbride writing, says specifically, we make no opinion on what effect, if any, the 1998 amendment to Section 1-210 had, where they added that sentence I talked about before. In other words, you always apply the Tort Immunity Act definition. Because the accident in Murray predated what happened in 1992. So what the Supreme Court says in Murray is dealing with the pre-amended version of 1210. And that's exactly the distinction the First District was drawing in Taglier. They came to the same conclusion. So when they said in Murray that the Wilco and Wanton Statute 1-210 incorporated the common law, they're talking about the pre-1998 210? Yes. That's part of it. And also part of it is what the Supreme Court really said in Murray, is my understanding, is this. Going back to Ziarko, Ziarko says the common law is over the board. That's what Ziarko says. It is a sliding scale, slippery slope. It is all over the board. And the Supreme Court said in Murray, well, you know, there were a bunch of common law decisions that actually applied the correct standard. And if you go and look at the jury instruction, you will actually find a definition that mirrors the Tort Immunity Act. And the Court said that's what the Court should be applying is the jury instruction definition. However, when you look at the common law as you take it in bold, it uses the word recklessness. It uses the word gross negligence. It uses the word ordinary care. In other words, the failure to repair something using ordinary care. You'll find those all through the common law. The Court in Murray talks about those and says we're not going to talk about, though, what effect, if any, the 1998 amendment had because all of those predated. And what the First District did in Tagliere was they said, yeah, that's exactly correct. And because the legislature acted to amend the Tort Immunity Act in 1998 to add this additional sentence to 1210, essentially all of those common law definitions that were all over the board, unless they match up with the Tort Immunity Act definition, in other words, if they don't use the word recklessness, they don't use ordinary care, those can still apply, but you cannot use those after 1998. But did the 1998 amendment, other than saying you apply this definition, it didn't change the definition? It did not. It solidified that this is the definition that shall apply. In other words, the common law cases had been all over the board. The slippery slope in Ziarko. Some of the cases talk about slightly more than negligence. Some of the cases say it nears criminal misconduct. Those were all part of the common law. Those that match up with the Tort Immunity Act definition I have no argument with. It's the cases that talk about, for example, the failure to exercise ordinary care after knowledge of a defective condition. That, to me, sounds like negligence. That's the definition you'll read when you pull out the negligence structure from the jury instructions. That is not the Tort Immunity Act definition. That was the significance, I believe, in Murray. And then Taglier from the First District followed up on Murray and said, yes, that's exactly correct. The Supreme Court didn't address post-1998, and the Appellate Court First District says, and it's exactly what this Court said in Loewe v. Provena, where there's a specialized definition, and it's more stringent than the common law definition, as this Court talked about in Loewe v. Provena, the specialized definition. That's the one that shall apply. What was the purpose of, in your judgment, the amendment that the legislature enacted in 1998? I think there were two purposes. It happened at the same time that 3108, which is a supervisor immunity statute, was amended. 3108 was amended in response to a Supreme Court case called Barnett. You know Barnett better than I do. Barnett said 3108 is an absolute immunity. Even if you allege that the lifeguards intentionally didn't respond to a victim in distress, 3108 provides absolute immunity. The legislature said, that is not what we intended. And so they amended 3108. You'll see it's the same amendment date, December 2 of 1998. But at the same time, the legislature said, but we're going to tell the courts, we mean the statutory definition in 1-210 of the Tort Immunity Act. That was the very purpose of the additional sentence. And that is further verified by the legislative record, which is cited in technically there, Representative Dart said, the reason we're doing this is we don't mean the common law definition, we mean the more stringent statutory definition of the Tort Immunity Act. Well, as Justice Pope said, the difficulty I'm having with this entire analysis is Supreme Court Murray said, in reference to the 1998 amendment of 210, that its definition of lawful and wanton was a codification of existing law, but its plain meaning was entirely consistent with longstanding common law precedence. If that's the case, how does that reconcile with some of the common law precedence that were not as stringent? Sure. The best answer I can give you is it reconciles with some, but not all. In fact, Murray's on a collision course with Ziarda. So, once again, we're in a situation of, what's the Supreme Court meant to say? What they did say and how we interpret it. Is it entirely consistent with longstanding common law precedence, which uses the same language, but not with the other stuff? That's my understanding of what they mean. Because if they meant something else, as Justice McMurrow did when she went through ZIARCO, she essentially said, and I'm paraphrasing, these things are all over the board. They are absolutely all over the board. Slightly more than negligent, slightly less than intentional. And I would agree that's true. And my take on what the Supreme Court was doing in Murray was, one, trying to bring some order to chaos. A good thing that the Supreme Court's there for. And the other is, those cases that were consistent with the common law definition, as I said before, I have no problem with that. It's those cases that take a different definition. So, earlier cases purportedly dealing with willful and wanton misconduct, which did not define it as a course of action which shows an actual or deliberate intention to cause harm, or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and their property, were not embraced by the Supreme Court in Murray and should be disregarded. I would say that. Because that's not consistent with the statute. That's exactly the point. And here's why. If the Supreme Court said or meant differently, they have a separation of powers problem. Because the Supreme Court can't amend the Tort Immunity Act. We know that. And they can't read words into the Tort Immunity Act. We know that. And so, if the Tort Immunity Act says, this is the definition that shall apply, and these are the words that are to be used, and any other court post-1998 applies any other definition, they've violated separation of powers, in my view, and I'm happy to take that argument out. That's why I don't think the Supreme Court is saying every prior case is consistent. So, you think the Caraleos case is an overstatement when they talk about the common law definitions and remain persuasive? Persuasive is different than controlling. Persuasive means... I'm not sure what that means either, but it seems to incorporate stuff less stringent than the Tort Immunity Act, and it's no longer valid. It's your position. Yes. I would say it's not valid if it's not consistent with the Tort Immunity Act. You're absolutely correct. Are you suggesting that we should follow the First District's decision on Pellier versus West Springs? Peglier? Yes. Yes, I am. I am suggesting that. That's my reason, and we should agree with it. Yes. I actually believe that that's consistent with the First District and Peglier not only cited and discussed Murray, but also cited and discussed the statutory definition and went through what I thought was a persuasive, probably a poor use of the term, but a persuasive reasoning for... It explained, along with citation, statute, and precedent, for why that made perfect sense. And what was interesting, the First District didn't say, you can't look at any prior precedent. What they did say is those that deviated from, that applied a lesser standard, used different wording than the Tort Immunity Act definition, should not be applied after 1998. And they gave us an example, one of their own cases, which was Burlingame versus Chicago Park District, where the court ended up in this weighing process about risk versus benefit and such things. The court said, we're not going to do that because that doesn't match up with the Tort Immunity Act definition. The other couple of points I was going to mention. Justice Steigman, you noted this, I believe, when you were discussing Sister Doris, but there were several points along the way here where the Park District actually exercised a conscious regard for the safety of patrons, which, in my view, and under the case law, negates any possibility of willful or unwanted conduct. There's no dispute that there was padding on the beam. Plaintiff's counsel disputes whether that padding was adequate, and if I heard him correctly, what he said was, well, the plaintiff was injured, therefore the padding wasn't adequate. And if that becomes the standard, if it's a question of fact, on a willful and unwanted issue, every time someone gets injured, and the issue is, well, because they were injured by definition, it's a question of fact as to whether the padding or whatever safety device was adequate or not, every case is going to go to a jury trial. That is absolutely what's going to happen, and that's why the Tort Immunity Act was adopted to prevent that. But other steps that they took, I mentioned the USTA exceeding the guideline, putting up the curtain.  makes this an act of willful and unwanted. When in fact, the undisputed affidavit testimony before the court, which is the affidavit of Mr. Spencer, is putting up the curtain actually was for the safety of players. One of the reasons, there were several, one of the reasons is it deadens the balls, which if any of us ever played tennis, when you hit balls off the solid surface, they roll back on the court, they become a tripping hazard or an ankle break hazard. It deadens the balls back by the curtain, but the other important thing it does, and why we don't use a mesh curtain, a see-through curtain, is because people, there's no dispute, behind the court it's a pathway, a walkway. People walk through there. If you're playing tennis and you have people that you can see crossing behind, you're never going to pick up a serve because you're going to be confused. So what's the story? In retrospect, if not use the mesh curtain, just use better or more padding? Is that what might have avoided the accident here? Actually, I'm not sure that any game that's played inside a building or inside in a closed facility, you can ever avoid a collision injury. Let's look to, let's not look behind the court, let's look to the center of the court. There are two solid steel posts that used to support the net. Those things are in there. Those are an unavoidable collision hazard. You can pad the heck out of them and you can still have an injury. Your time is up, but I want to ask you one last question. It pertains to what Mr. Doris said at the end of his remarks about the affidavit from the architect that he had in opposition to your affidavit. How should we view that? Actually, I'm not convinced that it's before the court. I've read and reread. Why not? What do you mean? It's the appellant's obligation to raise issues clearly for the court, and I've read through the appellant's brief, and I don't find where the appellant ever challenged Judge Jones's specific decision that that affidavit was not properly before him. He ruled that way. It's in the record. I'm not sure I understand. Whose affidavit? The affidavit of the architect, Burris. Okay, wasn't it? That's an architect. Wasn't it properly before Judge Jones? Is that what you're saying? Judge Jones ruled that he was not relying on that affidavit, and so that becomes a ruling of Judge Jones. I did not find that Plaintiff Appellant separately appealed that, so I come back to it. I'm not convinced that that's properly before the court. If the court believes it's there, I've given a whole bunch of reasons in my brief for why the plaintiff had never pleaded the accessibility code. Therefore, it's not part of it anyway, but even if he had, the architect says, essentially, I find this violates the accessibility code, and I ask that the court disregard it because it's illegal. Thank you, Mr. Doris. Any rebuttals, sir? Thank you very much. Well, I'll start with that issue first. Okay. I'm not sure I understood the logic, but it was before the court. Judge Jones didn't rule that it was incompetent evidence. He just said, I choose not to rely on it. It was before that court. This is a de novo here, so I think you clearly can consider that. What we had here today, and I want you to sincerely, and I have great respect for the gentleman, but we had an argument by Mr. Dutton that, I don't know what percentage of the time, was about an issue that's not an issue. The plaintiff, in this case, accepts the definition totally of utter indifference to or conscious disregard for the safety of others. We do not apply any other definition. Well, and let me begin by saying, I appreciate that in clarification, and it's important, but we're looking for guidance and standards here. Do you agree that Mr. Dutton is correct that common law cases that contain criteria less significant, less difficult maybe, than 1, 2-10, are really no longer valid when we're evaluating the Thorne Immunity Act. We have to look to that language. I might only quarrel with the word valid. I think that they clearly, the very case and other decisions, I don't think they're controlled. I think they're guidance. Look, every case we depend on, our park district or city cases, except O'Lee's. The reason O'Lee's aside is because of the striking similarity, and there is guidance about hiding a defect that's in that case that I think, and quite frankly, Your Honor, Mr. Justice Steinman, I don't know that cases that were decided on the definition of reckless are no longer invalid, because I can't, in my simple mind, distinguish between utter indifference and reckless. Well, that's a good point. Some of those cases were. Would it be correct that this Court and trial courts, when wrestling with these different difficult concepts, should focus, maybe this is the best way to put it, should focus on the statutory definition of 1-2-10, period? Which we do. And we rely on cases that are decided. That's the definition we're applying to this case. But the only place that became an issue was whether you should even look at the O'Lee's case, and I believe you should for guidance because of the striking similarity defects. On the USTA minimum, I don't think I said that it had no safety application. What I said is the record is totally silent. We only have one page, and there's nothing in this record. And I think a jury, if they were presented with that evidence, could find the inferences. It's for conduciveness of play. Because I say that, because look at the Spencer affidavit. The Spencer affidavit says we did some things for safety. He never referred to the USDA standards. He referred to the TARP itself was a safety. And that may be fine, but it was all about conduciveness of play, and it hid the defect. That's what we're basing our case that it rises to utter indifference, is if you have a condition, you make minimal attempts to make it safer, that's an admission that it's dangerous, and then you hide it. That's conscious disregard for safety, to hide that defect, and that's what our case is all about. If you disagree with that, you would agree with Judge Jones' opinion. If you see this the way I do, that that's conscious disregard, or jury can find it, then you should reverse it. Thank you. Well, counsel, I'm not sure I would agree with Mr. Dutton's silver tongue devil characterization, but both you and he gave us some very fine arguments, and I want to thank you for it. Well, I have great respect for him, but I think he's a silver tongue angel. We'll take this matter under advisement.